FANCHER *v.* STATE.

4305                                          172 S. W. 2d 680

Opinion delivered June 21, 1943.

*Claude A. Fuller* and *John W. Nance,* for appellants.

*Guy E. Williams,* Attorney General, and *Earl N. Williams,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, C. J. Claris and Troy Fancher, brothers, were charged with having murdered Johnny Roberts. Claris was found guilty of second degree murder and sentenced to serve twenty-one years in prison. The verdict as to Troy was voluntary manslaughter and the penal sentence was seven years.

Error relied upon for reversal of the judgment against Claris is that the court abused its discretion in refusing a change of venue. The same contention is made by Troy, with the additional insistence that testimony was insufficient to support the jury's finding.

Appellants alleged in their petition that inhabitants of the Eastern District of Carroll County were so prejudiced against them that a fair trial could not be had.[1]

Eleven affiants subscribed the petition for a change of venue. Ten were examined in open court. The ruling was that ". . . none of said compurgators is credible. They are not sufficiently informed as to the sentiment of the Eastern District of Carroll County concerning [ability of the defendants] to secure a fair and impartial trial."

There are fourteen townships in the Eastern District—Polo, Prairie, Cabanal, Omega, Yocum, Hickory, Liberty, Piney, Dry Fork, Long Creek, Coin, Carrollton, Osage, and Delmar.

Hammonds was the first subscriber to the affidavit who was interrogated. On direct examination he testified that the minds of the people were so prejudiced that the defendants could not get a fair trial. The witness had visited the town of Green Forest, in Hickory town-

---

[1] Additional statements in the motion were that brothers and other relatives of Johnny Roberts gathered within two hundred feet of the jail at Berryville the morning after the shooting, "where they threatened an attorney for the Fanchers and their mother"; that the court, fearing for the prisoners' safety, (or the sheriff on his own account) transferred them to Benton County. Later Oscar Hamblin, Carroll County sheriff, was accused by brothers of the deceased of being prejudiced in favor of the Fanchers "and threatened to do the sheriff violence." As a result, Hamblin shot and wounded Parker Roberts, a brother of the deceased. The court disqualified the sheriff and directed the coroner to act during trial. Finally, it was averred that the coroner, not being acquainted throughout the county, named two deputies "to make out a special venire."

ship; Berryville, in Prairie township; and Alpena Pass.[2] He lived near Oak Grove, in Yocum township.

On cross-examination Hammonds said he had not been in Coin, Carrollton, Osage, Delmar, Dry Fork, Piney, or Liberty townships, but had heard the case discussed quite generally in Berryville and by people around Berryville.

Ami C. Howerton, of Green Forest, claimed to be well acquainted throughout the county. He did not think the defendants could get a fair trial. However, on cross-examination there was the statement:—"I guess twelve jurymen could be found who would give the boys a fair and impartial trial, but I wouldn't want the job of hunting them."

John Branham, while sustaining the defendants' contentions in his direct examination, and claiming to be well acquainted "all over the county," conceded that twelve men might be found who would set aside their opinions, "but it would be better for everyone concerned if the case is removed."

John D. Seals thought he knew the sentiment of the county, but had not been in a number of townships and couldn't say he knew the defendants could not get justice.

Jerry Warren's testimony was similar to that given by Seals.

Lee Cowan, on cross-examination, (as in his direct testimony) said that "from the sentiment I heard, these men would not make good jurymen." He resided in Long Creek township, in the extreme northeastern part of the county, and had been in "Berryville, Green Forest, Alpena, Enon, and Coin townships.[3]

E. E. Swor, residing three miles east of Green Forest, "doubted" the defendants could procure a fair trial. He knew "lots" of people in Liberty township,

[2] In the extreme southeastern part of Coin township on Highway 68 near the Carroll-Boone County line.

[3] Of the places named, only Coin is a township. There is also a community called Coin, in the township of the same name.

where the killing occurred—where the Fanchers and Johnny Roberts lived. Had also heard citizens of Coin township discuss the matter. On cross-examination this witness expressed the belief that it was possible to secure twelve men as jurors "who would take the oath, but I don't know whether it would be fair and impartial or not. . . . You might get a jury to try the case solely on the law and evidence, but you would have some mountain to climb." On redirect examination Swor again expressed doubt that a fair jury could be secured.

S. S. Epley of Denver (Long Creek township) testified the defendants lived mostly in Liberty and Piney townships. Heard the case discussed at Berryville and Green Forest and knew the people in the county "who have influence." Did not know what the sentiment was in Osage, Delmar, Liberty, or Piney townships and would not testify that twelve men could not be found who would try the defendants fairly, but "it would be hard for this to be done." On re-cross examination Epley testified that he "still believes a jury of twelve men, free of bias and prejudice, could not be found to give the defendants a fair trial."

E. E. Swor, recalled, said he had lived in "this" district sixty years. Was acquainted with all the old Fanchers. "Uncle Polk" Fancher was clerk and county judge. Tom Fancher was county judge and prosecuting attorney—both having been lawyers. Oden Fancher was "first collector and then county judge. He ran against Clay Maples for county clerk for a second term and was elected. Here is my opinion: The Fanchers have held offices in this county for a good many years. People are not prejudiced against the Fanchers—only prejudiced against Tom and his boys, these defendants. Polk Fancher has been dead for thirty years. Tom Fancher left the county a long time ago."

Wesley Perkins, who lived three miles north of Berryville, had heard a lot of talk in Prairie township and didn't believe the defendants could get a fair trial. Hadn't talked to anyone from Yocum, North or South Long Creek, Coin, Carrollton, Osage, Delmar, Dry Fork, Piney, or Liberty townships.

Lee Richardson, of Melton (Omega township) testified that "If you were in the boots of the defendants, you wouldn't want to be tried here. I am talking principally about the sentiment at Berryville, in Omega, and in Dry Fork and Piney townships." On cross-examination the witness admitted he had not been in Yocum or Dry Fork townships and:—"The only township I actually know about is where I live. All I know about the other townships is what I have heard."

Sam McKinney, of Cabanal township, testified he "couldn't say whether the defendants could obtain a fair trial. Sentiment is strong against them, but it would be difficult to procure an impartial jury." [4]

A tabulation of the testimony given by the eleven witnesses, through whom it was undertaken to support the allegation of prejudice, shows that none was informed as to sentiment throughout the district. It might be said that a composite of statements includes testimony relating to sentiment in each of the fourteen townships. For instance, Sam McKinney, as an exhibit, introduced a poll list showing payment by 2,440 electors in the eastern district. On direct examination he claimed to have been "over all the townships in the last two months." He did not state, however, that adverse sentiment prevailed in all of the townships. The exhibit did not include Yocum. Only Richardson claimed to have been in Omega. Perkins had been in Polo, and Howard had been in Delmar. McKinney alone, of all the witnesses, claimed to have been in Cabanal.

In *Heddin v. State,* 179 Ark. 1079, 20 S. W. 2d 119, it was held that an affiant, to qualify as a credible person under what is now § 3918 of Pope's Digest ". . . must be cognizant of the prejudice existing throughout the whole county and not merely in portions thereof." In *Spear v. State,* 130 Ark. 457, 198 S. W. 113, the statute was construed to mean that subscribing witnesses "shall have fairly accurate information concerning the state of mind of the inhabitants of the entire county toward the defendant."

---

[4] R. O. Garner, who signed the affidavit attached to the motion for a change of venue, did not testify. Sam McKinney did not sign the affidavit, but testified.

The ruling in *Bailey* v. *State*, 204 Ark. 376, 163 S. W. 2d 141, is that the court did not err in considering affidavits traversing those offered in support of the petition for a change of venue. It is also said that witnesses may be heard to assist the court in determining whether allegations contained in the affidavits are true.

The concurring opinion in the Bailey case expresses the view that the trial court "may pass only upon the credibility of the persons who, by affidavit, support the petition for a change of venue." The writer of the concurring opinion cited *Spurgeon* v. *State*, 160 Ark. 112, 254 S. W. 376, where it was said that ". . . the cases also hold that the statute on this subject does not contemplate that the truth or falsity of evidence shall be inquired into, and that the only question for the determination of the court is whether or not the affiants are credible persons, and that all inquiry must be confined to that question."

It would seem that the differences expressed in the majority and in the concurring opinion in the Bailey case relate to the word "credible"—that is, What may the trial court consider in determining whether affiants are credible persons within the meaning of the statute? The majority opinion holds that the lower court "is authorized to determine the truth of the *matter*"; and "matter," as there contemplated, appears to mean the content or substance of the affidavits; hence, the Bailey decision necessarily has the effect of broadening the scope of inquiry courts are permitted to pursue and allows discretion in finding whether the affiant has the knowledge he asserts.

It is not accurate to say that the older cases hold that affiants may not be examined to ascertain the source of their knowledge, the scope of their information, and any other essential fact bearing upon credibility. While the court may hear testimony on the question of credibility, it may not permit witnesses to be called for the purpose of giving independent testimony that a fair trial may be had, and that prejudice does *not* exist; nor may the court substitute its own information or be-

liefs for those of the affiants when such information is *dehors* the record. *Ward* v. *State,* 68 Ark. 466, 60 S. W. 31.

One who swears recklessly or who is generally known to be wanting in reputation for truth and veracity, is not credible. If it should be shown that one who swore he knew the sentiment of a county had continuously been in a foreign state since the alleged crime occurred, his assertion of popular prejudice would not be the testimony of a credible person. Other instances of wanton or reckless disregard in respect of the subject-matter might be shown. A broad discretion rests with the trial court, and this discretion should not be disturbed except for compelling reasons.

In the instant case the court did not discard testimony of the affiants in favor of a preconceived opinion, nor did it accept testimony of contradictive witnesses. After considering statements of all who appeared, their admissions on cross-examination, their opportunity to be informed in respect of assertions made, their expressed conception of impartiality in the light of constitutional and statutory guarantees—when these currents of interest, knowledge, and understanding were weighed in their relation to facts, it was the court's belief that prejudice had not been sufficiently shown by credible persons. We are not willing, therefore, to say there was an abuse of discretion.

The next question is whether evidence was sufficient to sustain the conviction. It is not seriously argued in respect of Claris that the testimony did not present an issue for the jury; but as to Troy the contention is that he had nothing to do with the homicide, but was merely an unfortunate spectator and the victim of circumstances.

The shooting occurred on a highway where the Fancher brothers had parked two trucks. The truck operated by Claris was on the left of the road as Johnny Roberts approached in a Dodge pickup, followed by Gene Roberts, who was in another conveyance. Parker Miller was with Johnny. The road appeared to be par-

tially closed with the Fancher trucks. According to Miller, Johnny stopped and, addressing Gene, remarked upon the seeming blockade. Claris said, "No, you can get through." The Fanchers were standing on a narrow bridge at the rear of one of the trucks.

Miller testified that when Johnny "started through," Troy stepped upon the running board on the right side. Simultaneously Claris went in front of Johnny's car and caught the left running board. When Claris opened the cab door he was almost dragged off the Roberts car because of its close proximity to one of the parked trucks. Claris, after closing the door to avoid being hit, opened it again and pulled Johnny out and killed him. One shot was fired after the assaulted man struck the ground. The witness said, regarding the second shot: "Claris kinda bent over and I heard the second shot."

Troy ran around to the scene of action, then went back to the right side of the Roberts truck and, apparently addressing Miller, said: "Lord, what do you boys mean?" Miller replied: "I never did you boys any harm." Troy said: "No, Parker—you are a good friend of ours."

It is in evidence that Claris' father and Johnny Roberts had disagreed a year or more before the tragedy and Claris, when told what had occurred, remarked that he would do his father's fighting for him. There was other testimony indicating bad blood.

Gene Roberts testified that "after Johnny fell and didn't move there was another shot." After the shooting Claris and Troy went around to where Parker Miller was sitting in the cab, and Troy said: "Don't hurt Parker—he is all right."

Lester Waldrop, who was near the Fancher brothers when the Roberts truck drove up, testified that after the shooting he saw Troy and Claris go around to where Parker Miller was sitting in the cab. Waldrop had previously stated that when Claris jumped on the running board "Troy did nothing but just stand there."

There was testimony regarding conversàtions between the Fanchers and members of their families—remarks made before and after the killing. They shed but little light on the transaction; nor is there anything of a substantial nature in the record showing criminal participation by Troy. The case against him rests entirely upon speculation. While it may be true that he acted in concert with Claris, the State has not satisfactorily shown the connection. As to Troy the judgment is reversed, and the cause is remanded for a new trial. Affirmed as to Claris.